IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CENTIMARK CORPORATION,          )
                                )
            Plaintiff,          )
                                )
     vs.                        )  Civil Action No. 11-1137
                                )
JON A. JACOBSEN,                )
                                )
            Defendant.          )

## MEMORANDUM OPINION

Pending before the Court is a motion for a temporary restraining order and preliminary injunction, filed by Plaintiff CentiMark Corporation ("CentiMark") at Docket No. 5.  Plaintiff seeks an order of Court preventing its former employee, Jon A. Jacobsen ("Jacobsen"), from unfairly competing with CentiMark by working for another nationally recognized roofing company in violation of an employment agreement between CentiMark and Jacobsen and from misappropriating Plaintiff's confidential proprietary and trade secret information in violation of the Pennsylvania Uniform Trade Secrets Act.  For the reasons discussed below, the motion is denied.

## I.  BACKGROUND

### A.  Factual Background[1]

CentiMark Corporation is one of the largest roofing

---

[1]  Unless otherwise noted, the facts in this section are taken from the Complaint and are consistent with the evidence present at the TRO/PI hearing.  Additional facts will be set out in the discussion below.

contractors in the United States and some parts of Canada.   It maintains approximately 65 offices and focuses its business on large-scale industrial and commercial roofing projects. CentiMark is organized into three activities relevant to the matters discussed herein: a sales force, a Business Development Team, and a National Accounts Group.

The function of the CentiMark Business Development Team is to identify new sales leads, target prospective customers, and develop relationships with its new customers, especially those businesses which function on a nationwide scale.  The National Accounts Group is comprised of a number of account managers who are assigned to specific territories or to specific national programs.  These individuals establish and maintain the relationship between CentiMark and its largest customers, a particularly important responsibility because the national accounts generate approximately 60% of CentiMark's annual sales revenue.  Understandably, the confidential information generated by the Business Development Team and the National Accounts Group is proprietary to CentiMark and of great business value to it.

Jon A. Jacobsen was originally hired by CentiMark in 1996 as a corporate accounts representative.  As part of the hiring process, Jacobsen entered into an agreement with CentiMark on September 19, 1996 ("the 1996 Agreement.")  This agreement

2

included a provision which precluded him first from disclosing or misappropriating CentiMark's trade secrets, proprietary information, and confidential information either during the time he was employed by CentiMark or at any time thereafter ("the non-disclosure provision.") Secondly, the 1996 Agreement established a two-year period beginning with his departure from the company for any reason during which he agreed not to engage in any activity which could be construed as competing with CentiMark's business ("the non-compete provision.)[2]    CentiMark and Jacobsen recognized in the 1996 Agreement that the reason for the post-employment provisions was the fact that in his position, Jacobsen would be privy to CentiMark's confidential business information, including access to the identity of the company's most valuable customers and its business development research and data.

During the next five years, Jacobsen progressed through the CentiMark hierarchy, eventually becoming the Senior Regional Sales Manager for the Florida Region in 1999.   In 2001, Jacobsen was let go from the company.

CentiMark rehired Jacobsen on August 30, 2004, as Regional Sales Manager for the Southern Group.   Again, as a condition of employment, Jacobsen signed an Employment Agreement which

---

[2]    The two provisions are discussed in greater detail below inasmuch as they form the basis for the claims brought by Plaintiff in this lawsuit.

explicitly incorporated the same post-employment provisions as those in the 1996 Agreement ("the Employment Agreement.")  Over the next seven years, Jacobsen was promoted into positions which exposed him to ever increasing amounts of CentiMark's confidential, proprietary business information.

On July 27, 2011, Jacobsen unexpectedly resigned from his employment at CentiMark, explaining in a letter to the company's founder and chief executive officer that he was to become President of Nations Roof South LLC ("Nations Roof South"), located in Atlanta, Georgia.  In the same letter, Jacobsen acknowledged the terms of the Employment Agreement and his intention to fully comply with the obligations set forth therein.

According to CentiMark's Complaint, Nations Roof South is one of its direct competitors.  Both companies offer commercial roof management services, including maintenance and asset management along with technical, preventative, restoration, replacement, and emergency services.  Like CentiMark, Nations Roof South, through its sister-companies in the Nations Roof, LLC ("Nations Roof") network, offers these services on a nationwide basis and competes for the same market in the commercial roofing industry.  In fact, according to the Complaint, the CentiMark National Account Team competes directly

4

with Nations Roof for the accounts of several large customers. Inasmuch as the companies are direct competitors, by going to work as president and an equity holder in Nations Roof South, Jacobsen allegedly violated the Employment Agreement.

      B.    Procedural Background

           CentiMark filed suit in this Court on September 8, 2011, alleging that Jacobsen (1) breached the non-competition provision of the Employment Agreement; (2) violated the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. § 5301 *et seq.* ("PUTSA"), by misappropriating, misusing and disclosing to Nations Roof and/or Nations Roof South confidential or proprietary business information belonging to CentiMark; and (3) is unfairly competing with CentiMark. Immediately thereafter, CentiMark filed the now-pending motion for a temporary restraining order ("TRO") and preliminary injunction ("PI"), seeking to enjoin Jacobsen's employment by Nations Roof South or any other competing business for a two-year period beginning as of the date of the Court's decision and enjoining him indefinitely from misappropriating, using, or disclosing CentiMark's confidential, proprietary trade secret information.

     After an initial case management conference, the Court heard two days of testimony on matters related to the TRO and PI, at which a corporate representative of CentiMark, John

Godwin ("Godwin"), the company's Executive Vice President of Sales and Marketing, and Jacobsen testified. Following conclusion of the hearing, on September 29, 2011, the Court directed the parties to file proposed findings of fact and conclusions of law. The deadlines established in that order were postponed several times on the representations of the parties that they were actively pursuing settlement. Those negotiations were ultimately unsuccessful. The parties have now filed their proposed findings and conclusions regarding the issues raised in the Complaint and at the hearings.

## II. JURISDICTION AND VENUE

CentiMark is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania. Jacobsen is currently a resident of Georgia. This Court therefore has jurisdiction over this matter based on complete diversity of the parties and, according to the Complaint, an amount in controversy in excess of the statutory minimum. *See* 28 U.S.C. § 1332(a)-(c). Jacobsen does not dispute the Court's personal jurisdiction over him.

Venue is appropriate in this Court under 28 U.S.C. § 1391(a) inasmuch as the Employment Agreement specifically provides that any litigation arising from the Agreement shall be brought in a court sitting in Washington County, Pennsylvania,

which is located within this judicial district.

## III. STANDARD OF REVIEW

It is well-established in this circuit that preliminary injunctive relief is "an extraordinary remedy which should be granted only in limited circumstances." AT&T v. Winback & Conserve Program, 42 F.3d 1421, 1426-1427 (3d Cir. 1994), *cert. denied*, 514 U.S. 1103 (1995) (internal quotation omitted.) The four elements the party seeking the injunction must demonstrate are equally well known:

> (1)  a "reasonable probability of eventual success in the litigation;"
>
> (2)  the existence of immediate irreparable harm if the relief requested is not granted;
>
> (3)  the possibility of harm to other interested persons (including the defendant) from the grant or denial of the injunction; and
>
> (4)  the public interest.

Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806, 812-813 (3d Cir. 1989).

Although the movant must present evidence "sufficient to convince the trial judge that all four factors favor preliminary relief" (Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir. 1990)), the first two criteria are essential.   Abu-Jamal v. Price, 154 F.3d 128, 133 (3d Cir. 1998); Hohe v. Casey, 868 F.2d 69, 72 (3d Cir.), *cert. denied*,

7

493 U.S. 848 (1989)(the motion should be denied if the party seeking relief cannot "demonstrate *both* a likelihood of success on the merits and the probability of irreparable harm if relief is not granted.") (Emphasis in original.) Rule 65 of the Federal Rules of Civil Procedure sets out the requirements for the court to consider when presented with either a preliminary injunction or a temporary restraining order and the standard for granting either form of relief is the same. Ride the Ducks, LLC v. Duck Boat Tours, Inc., No. 04-5595, 2005 U.S. Dist. LEXIS 4422, *13 (E.D. Pa. Mar. 21, 2005). The grant of injunctive relief is not a matter of right but is within the sound discretion of the district court. Spartacus, Inc. v. McKees Rocks, 694 F.2d 947, 949 (3d Cir. 1982).

## IV. ANALYSIS

The Court has relied on the parties' proposed findings of fact and conclusions of law in arriving at its conclusions below. In the interest of brevity, citations to the record are made only where an issue is in dispute. The analysis is organized according to the three claims brought by CentiMark in its Complaint.

### A. Breach of the Non-Compete Provision of the Employment Agreement

1. *Background:* After having graduated from college in 1983 with a degree in building construction management,

Jacobsen worked for a commercial roofing company for about nine years.  In 1996, he was approached by CentiMark for a position in its Westland, Michigan office.  When presented with the 1996 Agreement, Jacobsen became concerned about the non-compete provision, Section 4.05, because the roofing industry was the only area in which he had established any significant expertise. He therefore proposed, and CentiMark accepted, a paragraph which identified certain types of employment within the roofing industry in which he would be allowed to work despite a general prohibition against employment with "Competing Businesses"[3] for two years following termination of his CentiMark employment. (Transcript of Hearing held on September 28, 2011, Doc. No. 58, "Tr. 9/28," at 61.)  As drafted by Jacobsen, Section 4.05(d) of the 1996 Agreement stated:

---

[3]   "Competing Business" is defined in the 1996 Agreement as follows:

(i) any person, business, enterprise or other entity which sells or attempts to sell any products or services, or any combination thereof, which are the same as, or similar to, the products and services sold by CENTIMARK at any time, and from time to time, during the last three (3) years prior to the termination of Employee's employment hereunder or subsequent thereto during the period of time in which Employee is restricted from competing with Centimark pursuant to the provisions of this Agreement.

(ii)   any person, business, enterprise or other entity which solicits, trades with, advises, calls upon or otherwise does, or attempts to do, directly or indirectly, a business with any clients, customers or accounts of CENTIMARK, its successors, assigns, subsidiaries or affiliates, that have done business with CENTIMARK at any time, or from time to time, during the period of Employee's employment hereunder.

(Tr. 9/20, Exh. 1, 1996 Agreement, § 4.05(a)(i) and (ii).)

> Notwithstanding anything contained in 4.05, Employee [i.e., Jacobsen] shall be able to work, after termination of employment, whether in a self employed capacity or as an employee, in the residential shingle contracting business, as or for a Durolast contractor, or as or for an SBS or APB[4] Modified roofing contractor. In addition, Employee may work for a roofing materials manufacturer or a wholesaler or distributor of roofing materials.

(Transcript of Hearing held on September 20, 2011, Doc. No. 32, "Tr. 9/20," Exh. 1, 1996 Agreement, § 4.05(d).)

After Section 4.05(d) was inserted into the proposed agreement, Jacobsen agreed to go to work for CentiMark as a Corporate Account Manager in Michigan. He and his family subsequently relocated from Michigan to Florida in order for him to take the position of Regional Sales Manager. Less than a year after moving, in March 2001, he was told that his position was being eliminated and his employment terminated. He was able to negotiate a different position within the company, only to be terminated just five months later on August 31, 2001.

In the August 31 letter from CentiMark officially terminating his employment, Jacobsen was told he would receive eight weeks of severance pay. Upset about the fact that he had been abruptly terminated, Jacobsen wrote to the CentiMark vice president for human resources, requesting additional severance pay and greater flexibility in seeking employment within the

---

[4]   Defendant states (Doc. No. 62 at 4, n.4) and Plaintiff does not disagree, that "APB" is a typographical error in the 1996 Agreement and that "APP" is the proper abbreviation.

commercial roofing industry. (Tr. 9/28 at 76 and Exh. I.) In response, CentiMark's in-house counsel, Annemarie Hoffman, indicated that CentiMark would provide 15 weeks of severance in exchange for his agreement to a Settlement and Release which precluded him from working for any roofing company other than one which performed only residential shingle work. (Tr. 9/28 at 79 and Exh. K.) Jacobsen refused the condition limiting his post-CentiMark employment to roofing companies that only did residential shingle work because he believed it contradicted the full scope of Section 4.05(d) of the 1996 Agreement. (Tr. 9/28 at 80 and Exh. L.) CentiMark ultimately agreed to modify the Settlement and Release and allowed Jacobsen to work for certain types of roofing companies in Florida, Michigan and Northern Ohio. (Id. at 80 and Exh. M.)

Between 2001 and mid-2004, Jacobsen worked for a series of roofing companies in a variety of positions including general manager for a commercial roofing company specializing in sheet metal and modified bitumen systems and regional sales manager for General Roofing Services ("General Roofing") which was, at the time, the largest commercial roofing company in North America. As required by Section 4.08 of the 1996 Agreement, CentiMark was kept apprised of these jobs and did not object to them. In 2004, General Roofing filed for bankruptcy. Its

11

former chief executive officer, Richard Nugent ("Nugent"), formed a new company, Nations Roof, and offered Jacobsen a position as president of the company's office in Orlando, Florida, which had not yet been established.  Jacobsen declined Nugent's offer, but remained in contact with him.

CentiMark contacted Jacobsen again in mid-2004, offering him the position of Regional Sales Manager in the Atlanta, Georgia office.  As a condition of employment, Jacobsen agreed to the updated Employment Agreement which explicitly incorporated Articles I through VII of the 1996 Agreement, including Section 4.05(d).  In 2008, Jacobsen was transferred to a position which he considered a demotion; he was also dissatisfied with a second transfer in 2009 because he was no longer managing people and believed his career had taken a step back since relocating to Atlanta.  (Tr. 9/28 at 95-97.)  In 2010, Nugent offered Jacobsen a sales position with Nations Roof.  Jacobsen declined that offer but expressed an interest in a management position.  In 2011, Nugent offered him the position of president and general manager of Nations Roof South, which he accepted.  (Tr. 9/28 at 97.)

On July 27, 2011, Jacobsen resigned from CentiMark in a conversation with Godwin and an e-mail message to Edward Dunlap ("Dunlap"), CentiMark's chief executive officer.  In the e-mail,

Jacobsen assured Dunlap that he intended to comply with the terms of his Employment Agreement and explained that Nations Roof South primarily performed new construction, "plan room bid-work," and consultant referrals, all areas in which CentiMark typically did not engage. (Tr. 9/28 at 103 and Exh. V.) He further explained that he was not going to be responsible for sales at Nations Roof South and that prior to accepting his new position, he had informed Nugent of this restriction. His responsibilities at Nations Roof South would be limited to managing field operations and the profit and loss of the business. (Tr. 9/28 at 102-104.) Despite these assurances, CentiMark filed suit against him without prior notice, contending he had violated the Employment Agreement.

    2. *Applicable law:*[5]   In Count I of its Complaint, CentiMark alleges that Jacobsen has violated the non-compete provision of the Employment Agreement by going to work for

---

[5]   Although Jacobsen argues elsewhere that Georgia law should be applied, as a Court sitting in diversity, we are required to apply the substantive law of the forum state. *See* Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); Edwards v. HOVENSA, LLC, 497 F.3d 355, 361 (3d Cir. 2007). When applying Pennsylvania substantive law, if there is no controlling decision by the Pennsylvania Supreme Court, this Court will consider decisions of intermediate appellate courts, which, although not conclusive, are indicative of how the Supreme Court might decide the issue. McGowan v. Univ. of Scranton, 759 F.2d 287, 291 (3d Cir. 1985)(in "appropriate circumstances," such intermediate court decisions may constitute "presumptive evidence" of Pennsylvania law.) Moreover, the Employment Agreement which is at the heart of this dispute includes a choice of law provision indicating that Pennsylvania law is to applied. (Tr. 9/20, Exh. 1, § 7.06.)

Nations Roof South.[6]   Pennsylvania law recognizes restrictive covenants prohibiting an employee from competing with his former employer.   Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 424 (3d Cir. 2010.)   While such covenants are disfavored as a restraint on trade, they are enforceable to the extent that they are "incident to an employment relationship between the parties; the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and the restrictions imposed are reasonably limited in duration and geographic extent." Victaulic Co. v. Tieman, 499 F.3d 227, 235 (3d Cir. 2007); see also Hess v. Gebhard & Co., 808 A.2d 912, 917 (Pa. 2002) (non-compete and other restrictive covenants "are not favored in Pennsylvania and have been historically viewed as a trade restraint that prevents a former employee from earning a living.")   "Generally, American courts insist that an employer may not enforce a post-employment restriction on a former employee simply to eliminate competition per se; the employer must establish a legitimate business interest to be protected." Hess, 808 A.2d at 918.

   Under Pennsylvania law, the interpretation of a contract provision is a matter of law for the court.   Swiss Reinsurance

---

[6]   The breach of contract claim also alleges breach of the non-disclosure provisions of the Employment Agreement; these are discussed below in the section addressing Count II, the claim that Jacobsen has violated or will inevitably violate the PUTSA.

Am. Corp. v. Airport Indus. Park, Inc., No. 07-3749, 2009 U.S. App. LEXIS 9701, *9 (3d Cir. May 5, 2009), *citing* Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 390 (Pa. 1986). "Determining the intention of the parties is a paramount consideration in the interpretation of any contract. . . .The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous." Hutchinson, id. at 389-390 (internal citations omitted.)

   3. *Plaintiff's reasonable probability of eventual success in the litigation.* To succeed on the merits of its breach of contract claim under Pennsylvania law, Plaintiff must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) *quoting* CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (internal quotation omitted.) There is no question that the parties had entered into the Employment Agreement in 2004, including the essential non-compete clause, and we therefore turn to the question of whether Jacobsen has breached that provision.

 CentiMark argues that Jacobsen has violated Section 4.05 of the 1996 Agreement, as incorporated into the 2004 Employment Agreement, by accepting a position with and holding an equity

interest in one of its most significant competitors.  Jacobsen
argues that the work done by Nations Roof and/or Nations Roof
South falls within Section 4.05(d) of the Employment Agreement
and he is therefore not in violation of that agreement.  But,
CentiMark argues, Jacobsen's position is clearly a *post hoc*
argument without merit for two reasons:  first, his attempt to
distinguish his new job at Nations Roof South in his resignation
letter to Dunlap does not mention Section 4.05(d); and second,
he has admitted that Nations Roof is a direct competitor of
CentiMark, not only with regard to the markets they serve, the
services and products they offer, and the customers they
solicit, but also past projects on which they have actually
competed.   We agree with the parties that determination of
whether Plaintiff is likely to succeed on the merits of its
breach of contract claim hinges on the interpretation of Section
4.05(d).

     Omitting some provisions not relevant here, Section 4.05(d)
provides that

>     . . . [Jacobsen] shall be able to work. . .in the
> residential shingle contracting business, as or for a
> Durolast Contractor, or as or for an SBS or APP
> Modified roofing contractor. . . . [and in addition]
> for a roofing materials manufacturer or a wholesaler
> or distributor of roofing materials.

CentiMark argues that Section 4.05(d) allows Jacobsen to work
only for a company which is in the "residential shingle

16

contracting business." This interpretation is refuted not only by a simple reading of the paragraph but also by Jacobsen's testimony.

Jacobsen testified he insisted that this paragraph be inserted into the 1996 Agreement because if he left CentiMark, he wanted to be able to "go to work within the industry for a company that installs steep slope shingles, or Durolast systems or APP and SBS modified Bitumen roof systems" which were the three areas he had worked in prior to becoming employed by CentiMark. (Tr. 9/28 at 61 and 63.) Nations Roof South is a licensed and approved Durolast contractor and installs SBS and APP modified roofing systems. (Id. at 63.) Durolast is a PVC single-ply membrane and APP and SBS are asphalt-based modified membranes used with hot asphalt. (Id.) These three products are not the type of roofing CentiMark installs, the "majority" of which are single-ply membranes, or, as Jacobsen also described them, "CentiMark's typical material selection when they install a roof would be a single-ply rubber or EPDM system, or a single-ply thermoplastic which would be a TPO or a PBC roof system." (Id. at 64-65; 67.) CentiMark provides only its own warranty as compared to the manufacturers' warranties applicable to roof systems using Durolast, SBS or APP, and CentiMark therefore does not offer those products. (Id. at 67.)

17

CentiMark did not cross-examine Jacobsen on these distinctions. (Tr. 9/28 at 120-123.) Instead, CentiMark offers only the argument that the phrases "as or for a Durolast contractor" and "as or for an SBS or APP Modified roofing contractor" modify the previous phrase "in the residential shingle contracting business." It concludes that "the sentence can only be read to mean that Jacobsen shall be able to work in the residential shingle contract[ing] business for either a Durolast contractor or an SBS or APP Modified roofing contractor." (Plaintiff's Proposed Findings of Fact and Conclusions of Law, Doc. No. 52, at 22-25, ¶¶ 121-130.)

The Court concludes that a reasonable finder of fact would more likely agree with Jacobsen's interpretation of Section 4.05(d) than with CentiMark's. First, based on Jacobsen's unrefuted testimony, Durolast, APP and SBS are not what would be commonly understood as "shingles" since those roofing systems involve "membranes" rather than individual pieces of roofing material. Second, there would be no reason to include provisions allowing Jacobsen to work "as or for a Durolast contractor or "as or for an SBS or APP Modified roofing contractor" if these were products that a "residential shingle contracting business" installed or, conversely, if a Durolast, SBS or APP Modified roofing contractor were considered a "residential shingle

18

contracting business."

Jacobsen testified that Nations Roof South primary does new construction, plan room bid-work, and consultant referrals, areas in which CentiMark does not engage to any extent. (Tr. 9/28 at 103.) Again, CentiMark did not cross-examine Jacobsen on this issue nor does it offer any evidence to refute this testimony. And, contrary to Plaintiff's argument that Jacobsen conceded that Nations Roof South and CentiMark are direct competitors, we find his testimony less clear cut than Plaintiff contends. (See Doc. No. 52 at 20, ¶ 109.) Plaintiff's first reference to the hearing transcript which purportedly verifies this admission by Jacobsen, Tr. 9/20 at 55, actually cites Godwin's testimony and the second, Tr. 9/20 at 38-40, does not refer to competition at all. Even when Plaintiff is given the benefit of the doubt and one assumes that CentiMark is referring to the transcript of September 28, 2011 instead, Jacobsen's testimony at page 55 does not discuss competition, only that he has not shared the information in a list of major CentiMark projects in progress with anyone at Nations Roof or Nations Roof South nor has he attempted to contact any company in that list. In his testimony at pages 38-40, he admits that in one instance Nations Roof (not Nations Roof South) already had an account which CentiMark intended to contest and in another, that there

19

was at least one other company besides CentiMark and Nations
Roof competing for a project. Two projects out of hundreds does
not establish that the two companies compete to any significant
extent in the same markets, services, products, or customers.

Finally, the fact that Jacobsen did not refer to Section
4.05(d) in his termination letter to Dunlap does not necessarily
mean this is a *post hoc* argument; in fact, the written evidence
points to the opposite conclusion. In a letter to CentiMark's
in-house counsel dated September 27, 2001, Jacobsen wrote:

> When I came to Centimark, I signed your employment
> Agreement. To my knowledge, it is still in effect.
> At that time you made changes to paragraph 4.05,
> subparagraph D, which allows me to work for a shingle
> contractor, a DuroLast contractor, or a modified
> bitumen contractor.

(Tr. 9/28, Exh. L.)

The ultimate agreement between the parties was that for
twelve months after October 26, 2001, the date on which the
Settlement and Release was executed, Jacobsen would

> not engage directly or indirectly, in the roofing or
> roof related business other than working with a
> government bid, new construction roofer, or
> residential roofing company in the State of Florida,
> Michigan and Northern Ohio. Nothing herein precludes
> Mr. Jacobsen from working for a roofing distributor or
> manufacturer.

(Tr. 9/28, Exh. M, ¶ 4.)

Moreover, a reasonable finder of fact might conclude
Jacobsen believed there was no reason to mention this provision

20

in his e-mail to Dunlap because he thought he had already won this battle. That is, he knew CentiMark did not seek legal redress when he went to work for General Roofing, whose products, services, and market were similar to those offered by CentiMark and in a capacity where he could, without question, use confidential information acquired during his tenure with CentiMark, i.e., as a regional sales manager.

In sum, the Court concludes that CentiMark is not likely to succeed on its claim that Jacobsen breached the non-compete provision of the Employment Agreement by going to work for Nations Roof South.

We need not consider the other prongs of the test applied in determining whether to grant a preliminary injunction because, as the United States Court of Appeals for the Third Circuit has held, "a failure to show a likelihood of success *or* a failure to demonstrate irreparable injury *must necessarily result* in the denial of a preliminary injunction." In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982) (emphasis added by the Court); *see also* S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot., 274 F.3d 771, 777 (3d Cir. 2003) (having found the plaintiffs' case "legally insufficient" when considering their probability of success in the litigation, the court indicated it would "go no further.")

B.    Violation of the
      Pennsylvania Uniform Trade Secrets Act

1.    *Background:*   In the Complaint, Plaintiff asserts
that during Jacobsen's two periods of employment with CentiMark
(1996 through 2001 and 2004 through 2011), he steadily rose
through the company's management hierarchy and was exposed on a
regular basis to confidential and proprietary information
pertaining to its sales activities, business development
strategies, and the marketing practices of the National Accounts
Group. CentiMark further alleges that during his ten years with
the company, Jacobsen used its marketing and business
development strategies, serviced its most valuable accounts,
trained other employees in CentiMark's methods of developing and
doing business, established long-standing relationships with its
most important customers, and gained insight into the unique
needs of its customers and potential customers. (Complaint, ¶¶
73-78.) According to Plaintiff, all of this information can,
and inevitably will, be exploited by any other roofing
contractors who offer products and services similar to those of
CentiMark and will give such competitors an unfair advantage.

In Count II of the Complaint, CentiMark alleges that it has
spent significant time and money developing these valuable trade
secrets and confidential and proprietary business information
relating to the roofing industry and to the company's

22

operations, customers, employees, financial data and products. It has taken steps to protect this information from disclosure, including requiring employees who have access to such information to execute employment contracts containing confidentiality provisions such as those in the 1996 Agreement and the Employment Agreement.   However, as President of Nations Roof South, Jacobsen "has and/or inevitably will misappropriate, misuse and disclose the trade secrets and confidential and proprietary business information of CentiMark to and on behalf of Nations Roof, a competitor of CentiMark's."   His disclosures will undermine CentiMark's competitive position and cause it immediate and irreparable harm.   (Complaint, ¶¶ 99-106.)

       2.   *Applicable law:*   Under the Pennsylvania Uniform Trade Secrets Act, a trade secret is defined as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
>     (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
>     (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S. § 5302, *see also* RESTATEMENT (2d) OF TORTS, § 757 and O.D. Anderson, Inc. v. Cricks, 815 A.2d 1063, 1070 (Pa.

Super. Ct. 2003).

This definition is essentially the same as that used prior to April 2004 when the PUTSA became effective. <u>Youtie v. Macy's Retail Holding, Inc.</u>, 626 F. Supp.2d 511, 529 n.10 (E.D. Pa. 2009) ("The PUTSA displaced Pennsylvania's common law tort for misappropriation of trade secrets, but there is no indication that the statute effected a substantive shift in the definition of 'trade secret.'")

Under Pennsylvania law, to establish misappropriation of a trade secret, the plaintiff must show that the defendant used or disclosed information that it knew or had reason to know was a trade secret and that the defendant acquired such information by improper means. 12 Pa. C.S. § 5302;[7] *see also* <u>Moore v. Kulicke & Soffa Indust., Inc.</u>, 318 F.3d 561, 566 (3d Cir. 2003), stating that the elements of a trade secrets misappropriation claim are "(1) the existence of a trade secret; (2) communication of the

---

[7] In full, "misappropriation" is defined as: "(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." 12 Pa. C.S. § 5302.

trade secret pursuant to a confidential relationship; (3) use of the trade secret in violation of that confidence; and (4) harm to the plaintiff." Failure to establish any one of the elements defeats the claim. Block v. Blakely, CA No. 02-8053, 2004 U.S. Dist. LEXIS 16920, *7 (E.D. Pa. Aug. 25, 2004).

The Pennsylvania Superior Court has identified a number of factors to be considered when determining if particular information constitutes a trade secret:

(1) the extent to which the information is known outside of the company's business;

(2) the extent to which the information is known by employees and others involved in the company's business;

(3) the extent of the measures taken by the company to guard the secrecy of the information;

(4) the value of the information to the company and its competitors;

(5) the amount of effort or money the company spent in developing the information; and

(6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

Crum v. Bridgestone/Firestone N. Am. Tire, LLC, 907 A.2d 578, 585 (Pa. Super. Ct. 2006); see also SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985).

In ascertaining what business information rises to the level of a trade secret, the court performs "a highly fact-

specific inquiry into the situation." Bimbo Bakeries USA, Inc.
v. Botticella, 613 F.3d 102, 113 (3d Cir. 2010). A trade secret
can consist of "a compilation of information which is used in
one's business that gives one an opportunity to obtain an
advantage over competitors." WellSpan Health v. Bayliss, 869
A.2d 990, 997 (Pa. Super. Ct. 2005)(internal quotation omitted.)
Certain confidential information may be protected by a non-
disclosure provision in an agreement even if it does not
necessarily qualify as a trade secret. Den-Tal-Ez, Inc. v.
Siemens Capital Corp., 566 A.2d 1214, 1224 (Pa. Super. Ct. 1989)
(en banc); Morgan's Home Equipment Corp. v. Martucci, 136 A.2d
838, 843 n.5. (Pa. 1957) (a non-disclosure covenant does not
create the right to protection, but "serves as evidence of the
confidential nature of the data.") There are also Pennsylvania
cases which suggest that courts will more readily act to protect
confidential information of a technical nature rather than non-
technical secrets. See Iron Age Corp. v. Dvorak, 880 A.2d 657,
665 (Pa. Super. Ct. 2005), and Oberg Indus., Inc. v. Finney, 555
A.2d 1324, 1327 (Pa. Super. Ct. 1989).

There are, however, some matters which do not qualify as
trade secrets. For example, the information must be particular
to the employer, not general secrets of the trade in which the
employer is engaged. SI Handling Systems, 753 F.2d at 1256,

26

*citing* Capital Bakers v. Townsend, 231 A.2d 292, 294 (Pa. 1967). An employee's aptitudes, skills, dexterity, or manual and mental ability cannot be a legally protected trade secret unless his use thereof is curtailed by agreement with the employer. Felmlee v. Lockett, 351 A.2d 273, 276 (Pa. 1976). Similarly, "other subjective knowledge as [the employee] obtains while in the course of his employment" is not protectable. Iron Age Corp., 880 A.2d at 663 (citation omitted.) In addition, "[i]f a competitor could obtain the information by legitimate means, it will not be given injunctive protection as a trade secret." WellSpan Health, 869 A.2d at 997 (citations omitted); Moore, 318 F.3d at 568 (technical information a competitor can develop independently is not entitled to protection.) Likewise, information which the employer makes little or no effort to keep confidential clearly does not qualify as a trade secret. NOVA Chems., Inc. v. Sekisui Plastics Co., 579 F.3d 319, 327 (3d Cir. 2009), *quoting* James Pooley, TRADE SECRETS § 4.04 (2009) ("the most important characteristic of a trade secret is that it is in fact secret.") In sum, "the crucial indicia for determining whether certain information constitutes a trade secret are substantial secrecy and competitive value to the owner." O.D. Anderson, Inc., 815 A.2d at 1070 (internal citation omitted.)

A court may enjoin the actual or threatened

27

misappropriation of a trade secret.  Bimbo Bakeries, 613 F.3d at 110, *citing* 12 Pa. C.S. § 5303(a).  A wide-ranging injunction that prohibits an employee from working in the relevant industry or soliciting customers of his former employee "is atypical; rather, the usual injunction merely prevents the employee from disclosing specified trade secrets."  Victaulic, 499 F.3d at 234, *citing* RESTATEMENT (3d) OF UNFAIR COMPETITION § 44 cmt. d (1995). The broader injunction is available under Pennsylvania law only when it is "virtually impossible for the employee to perform his duties for his new employer without in effect giving it the benefit of his confidential information." Victaulic, id. (internal citation and alternations omitted.)  A court considering whether to grant an injunction in a trade secrets matter "has discretion to enjoin a defendant from beginning new employment if the facts of the case demonstrate a substantial threat of trade secret misappropriation."  Bimbo Bakeries, 613 F.3d at 113.

3.  *Plaintiff's reasonable probability of eventual success in the litigation.*  We conclude that CentiMark has failed to show that it has a reasonable likelihood of succeeding on the merits of its PUTSA claim.

The 1996 Agreement (as incorporated into the Employment Agreement) included an expansive definition of  "trade secrets,

28

proprietary  information  and  confidential  information."[8]   The

Agreement further provided that

> Mr. Jacobsen further agrees, now and in the future for
> a period never to expire, that he will not disclose or
> disseminate   any   confidential   or   proprietary
> information or materials of Centimark to any person,
> firm  or  entity.  Such  confidential  information
> includes, but is not limited to, its bidding and/or
> pricing   structures,   profit   margins,   commission
> schedules, customer information, profiles and vendor
> information.  Mr. Jacobsen agrees that this Paragraph
> will survive expiration of the twelve (12) and twenty-
> four (24) months periods discussed in Paragraph 4 and
> will entitle Centimark to liquidated damages described
> in Paragraph 6 at any time now or in the future if
> same is breached.

(Tr. 9/28, Exh. M, ¶ 5.)

As summarized in a declaration submitted by Jacobsen, the

allegedly confidential information identified by CentiMark in

its  Complaint  consists  of  pricing  structures  for  current

customers, customers' roofing needs, projections and timing of

customers' future projects, "unique specifications," negotiating

strategies, customers' budgets, decision makers for actual and

---

[8] "Trade secrets, proprietary information and confidential information"
were defined as including but not limited to "technical information
such  as  methods,  processes,  formulas,  compositions,  inventions,
product development, machines, computer programs, special hardware,
product hardware, related software development, research projects,
ideas improvements, systems methods, and other confidential technical
data, and business information, such as sales, sales volume, sales
methods,  sales  proposals,  customers  and  prospective  customers,
identity of key purchasing personnel in the employ of customers and
prospective customers, details of previous calls and personal data
regarding  each  individual  buyer,  amount  or  kind  of  customer's
purchases from CENTIMARK and its divisions, sources of supply, system
documentation, pricing data (including general price lists and prices
charged  to  specific  customers),  and  marketing,  production  or
merchandising systems or plans."  (Tr. 9/20, Exh. 1, ¶ 3.02.)

potential customers, CentiMark's unique national marketing strategy, its marketing methodology using group purchasing organizations, general marketing and pricing methodologies, identities of customers, customer complaints or difficulties, CentiMark's sales volume, unique vendor and supplier relationships, and warranty information. (Doc. No. 19, Exh. 1, Declaration of Jon A. Jacobsen, "Jacobsen Decl.," ¶ 26.) Jacobsen contends that either (1) the information is not unique to CentiMark (e.g., pricing structures for current customers, negotiating and national marketing strategies); (2) he has no knowledge of the topic (e.g., customers' roofing needs or complaints, pricing methodologies); (3) any information he has would be stale or of no value to Nations Roof South (e.g., customers' budgets, unique specifications); or (4) the information is readily available through legitimate methods or is otherwise not confidential (e.g., customers' decision makers, marketing methodologies, identities of customers, annual sales volume.) CentiMark offered nothing at the hearing to refute these assertions even though the declaration had been offered in opposition before the hearings began.

There is no question, however, based on Godwin's testimony, that Jacobsen had access to a great deal of confidential business information during his employment by CentiMark. Godwin

indicated that some of the information compiled by CentiMark as part of its sales effort, e.g., a national account lead summary (Tr. 9/20, Exh. 5), contained information that could not be compiled simply by internet research, such as safety concerns, the type and length of the warranty the customer might seek, the overall general conditions of the client, and "information regarding how the proposal should be put together, based on what the customer is looking for." (Tr. 9/20 at 32-33.) He testified that contrary to Jacobsen's assertion in his resignation letter to Dunlap, CentiMark and Nations Roof compete "on a daily basis." (Id. at 55.) He identified approximately 15 companies and six specific roofing projects where his sales staff assured him the two roofing contractors were "competing head to head." (Tr. 9/20 at 57-58.) He further identified a number of markets and services in which the two companies compete, based on his own knowledge of CentiMark's business and the information provided by Nations Roof on its internet website. (Id. at 61-65.) Godwin also testified that "any time you spend time doing research and determining who your main targets are, the important ones at least, you don't need a piece of paper to figure out who to go after." (Tr. 9/20 at 31.)

CentiMark argues that Jacobsen, as President of Nations Roof South, a direct competitor of CentiMark, "will inevitably

call upon or otherwise misappropriate the confidential proprietary and trade secret information he learned as one of CentiMark's most significant sales and business executives." Specifically, Jacobsen "cannot erase from his mind" these trade secrets. (Doc No. 52 at 25, ¶ 135.)

The Court concludes that given all the facts and circumstances of the Jacobsen-CentiMark relationship and Jacobsen's duties at that company and at Nations Roof, CentiMark has failed to show that such disclosure is "inevitable." In fact, we conclude that CentiMark has failed to show even "a sufficient likelihood or substantial threat of disclosure." *See* Bimbo Bakeries, 613 F.3d at 116, stating that this formulation is the proper standard and referring to the discussion of "virtual impossibility" and the "inevitable disclosure doctrine" as discussed in Victaulic, 499 F.3d at 234, was dictum; *see also* Den-Tal-Ez, 566 A.2d at 1232, stating that the "proper inquiry" when granting or denying an injunction is not whether the defendant already has used or disclosed the trade secret, but "whether there is sufficient likelihood, or substantial threat" of him doing so, *citing* Air Products & Chemicals, Inc. v. Johnson, 442 A.2d 1114, 1122-25 (Pa. Super. Ct. 1982), and SI Handling Sys., 753 F.2d at 1263-1264.

Although information which is available on the internet or

32

in industry publications certainly is not protectable as trade secrets,[9] we shall assume that at least some of the information identified by CentiMark does in fact, rise to the level of trade secrets.   For the following reasons, having considered all the evidence presented by the parties, we find CentiMark has failed to show that there is a substantial likelihood that Jacobsen will disclose such information and, even if he were to do so, that CentiMark would be harmed thereby.

During the three years between Jacobsen's two employment periods with CentiMark, i.e., while he was bound by the non-disclosure provision of the 1996 Agreement, Jacobsen worked, with only minimal objection from CentiMark, for at least three other roofing contractors. When his employment with CentiMark was terminated in 2001, he had held the positions of salesman, regional sales manager, and southern regional marketing manager for five years and had to have known a great deal about CentiMark's sales activities and customers in the regions for which he had been responsible.   His new employment included a position as regional sales manager for the southern region of General Roofing, at that time the largest roofing company in the

---

[9]   Jacobsen's declaration states that information such as the identity of potential customers' decision makers or purchasing managers is readily available through internet services such as Hoover's business directory, that CentiMark publishes its annual sales volume on its website and in a national trade association journal, and that its warranties are common knowledge in the field.   (Jacobsen Decl., ¶ 26.) CentiMark offers no specific evidence to refute these statements.

United States and undoubtedly a direct competitor of CentiMark. Yet no evidence has been presented which would allow the finder of fact to conclude Jacobsen was ever accused of, much less found liable for, breach of the non-disclosure provisions of the 1996 Agreement. In fact, in 2004 CentiMark sought out and re-hired Jacobsen, actions which would not have been logical if the company had even the least suspicion he had disclosed its trade secrets to others. CentiMark presented no evidence that Jacobsen disclosed even a single iota of its confidential business information to any of those employers.

Second, Jacobsen testified that when he left CentiMark in July 2011, he turned over his computer, cellphone, and all marketing or other sales or customer information to Godwin who was in Jacobsen's office when he announced his resignation. (Tr. 9/28 at 98-99.) Godwin witnessed him doing so and completed an employee termination checklist, both men signed it, and Jacobsen left the building. (Id. at 99 and Exh. T.) He did not take copies of any documents or data relating to CentiMark's business or customers and did not download any data or business information to a portable storage device. (Id. at 99-100.) Godwin confirmed this testimony, admitting that when Jacobsen left CentiMark, "he took nothing with him," that is, he did not take a computer, telephone or any other company property. (Tr.

34

9/20 at 73.)   This case is therefore distinguishable from other cases as <u>A.M. Skier Agency, Inc. v. Gold</u>, 747 A.2d 936, 941 (Pa. Super. Ct. 2000), where the former employee clearly took a customer directory and various other confidential account information to his new company, or <u>CentiMark v. Lavine</u>, CA No. 11-757, 2011 U.S. Dist. LEXIS 82691, *7-*8 (W.D. Pa. July 28, 2011), where there was strong evidence that the employee might have taken confidential information on a missing computer drive.

Third, in his e-mail to Dunlap announcing his termination, Jacobsen told the CentiMark CEO that he understood the conditions of his Employment Agreement and intended to fully abide by those obligations; that he had no sales responsibility in his new role; that he would not solicit CentiMark customers or employees; and that the areas where Nations Roof South focused its market were not competitive with CentiMark "to any extent."   (Tr. 9/28 at 102-103 and Exh. V.[10] )

Jacobsen testified that in his discussions with Nations Roof South, he had advised Nugent and Carey Kerley, the CEO of Nations Roof, that he was not able to solicit any CentiMark customer with whom he had contact while employed by CentiMark or

---

[10]   Jacobsen wrote in his termination letter, "I understand the conditions of my [Employment] Agreement and fully intend to abide by them.   I will have no sales responsibility in my new role, and will not solicit any CentiMark customers or employees.   Nations Roof [South] does primarily new construction, plan room bid-work and consultant referrals.   Some single ply, metal and steep slope, but mostly hot systems."   (Tr. 9/28, Exh. V.)

to be involved in sales.  He further testified that he had not contacted any entity included in several lists of customers compiled by CentiMark (Tr. 9/20, Exhs. 16 through 22) and had not shared information with anyone at Nations Roof South or Nations Roof regarding those customers or entities.  (Tr. 9/28, at 55-57.)  He had not attempted to contact nor did he intend to contact such customers and had not utilized any information to which he had access while employed by CentiMark.  (Tr. 9/28 at 103-105; 110-112.)

Godwin confirmed these statements, acknowledging he had no evidence Jacobson had contacted or attempted to contact any CentiMark customer or performed services for such customers. (Tr. 9/20 at 74.)  He had no information which would lead him to believe that since his departure Jacobsen had accessed CentiMark's database of customer information, pricing, profitability, customer contacts, and similar information.  (Tr. 9/20 at 79.)  Based on the detail of the lists presented as evidence at the hearing, we conclude, as did the court in Oberg, that these reports, to the extent they contained confidential information, "were so voluminous that they could not have been committed to memory."  Oberg, 555 A.2d at 1327; see also Iron Age Corp., 880 A.2d at 664, refusing to enjoin a sales manager who went to work for a competitor in a similar position because

36

the trial court concluded the Iron Age customer list was "available to competitors through legitimate means and [could not] be declared a trade secret." This case is also distinguishable on its facts from CentiMark Corp. v. Vitek, CA No. 10-13920, 2010 U.S. Dist. LEXIS 138302, *7-*9 (N.D. Ill. Dec. 29, 2010), where the defendant shared confidential information regarding CentiMark's gross profit data during negotiations for a new position, even though he recognized this was proprietary information. Here, there is no evidence that Jacobsen was asked for or provided confidential information to Nations Roof South while discussing a potential new position with that company.

Fourth, Jacobsen testified that contrary to CentiMark's underlying premise that it was in direct competition with Nations Roof South, the two companies focus on different markets. He stated that CentiMark did "very little new construction, no bid work, [and] no public work that I know of," the three areas he had identified as Nations Roof South's principal areas. He went on to explain that this was because those areas were "very competitive" and "the profit margins aren't there to support [CentiMark's] overhead structure;" in addition "most times those types of projects require [a] manufacturer's warranty or a consultant to be involved," and

CentiMark "typically" does not offer manufacturer's warranted systems or work with consultants "as a general rule." (Tr. 9/28 at 82.) He further testified that the projects for Nations Roof South are "public bid, they are brought to us by consultants, they are new construction, they are work that's done with roofing consultants." (Tr. 9/28 at 7.) The Court concludes that the evidence presented at the hearing supports the conclusion that although the two companies are located in the same region and both are in the commercial roofing industry, there are sufficient differences in their target markets and business practices to minimize the importance to Nations Roof of any CentiMark information Jacobsen might disclose.

Fifth, Jacobson testified that when he was asked by the CEO of Nations Roof if he were interested in managing operations, he told him he was, indicating "I have that experience and I have that capacity and that would be allowed under my agreement." (Tr. 9/28 at 97-98.) Godwin testified that Jacobsen did not manage operations while at CentiMark. He further acknowledged that Jacobsen's knowledge of the commercial roofing business was not gained solely through his employment with CentiMark. (Tr. 9/20 at 77.) Other than the blanket assertion that "Jacobsen cannot erase from his mind CentiMark's confidential, proprietary and trade secret information" and that in his new position as

President of Nations Roof South, he will "inevitably call upon or otherwise misappropriate" that information (Doc. No. 52 at 25, ¶¶ 134-135), CentiMark has not provided a single example of how, as a Nations Roof South employee responsible for operations and profit and loss and explicitly not charged with sales responsibilities, Jacobsen would use any specific information he gained while employed by CentiMark.  Godwin testified that there were three ways to improve a company's profit and loss – increase operational efficiencies, increase sales volume, and shift to customers that are more profitable.  (Tr. 9/20 at 54-55, 68-69.)  But, as noted above, he conceded that Jacobsen's knowledge of operations management was not learned while employed by CentiMark (id.), and Jacobsen testified that the two companies focused their efforts on distinct markets through different methods (Tr. 9/28 at 7, 64-67.)  We find the situation here similar to that of Weissman v. Transcon. Printing U.S.A., Inc., 205 F. Supp.2d 415, 428, n.10 (E.D. Pa. 2002), where Weissman not only demonstrated he had a store of general knowledge gained during his previous career and the court found that much of the information he had gained in his position with Transcontinental Printing would be "simply not useful to him" in his new employment even though the two companies were in the same industry.

39

Finally, the Court was able, during the hearing, to observe Jacobsen's demeanor and listen to his answers under oath. When asked by CentiMark's counsel, "Over the next two years. . . if this Court doesn't issue an injunction, other than your word or your integrity, what's to prevent you from [exploiting confidential CentiMark information] after these proceedings are closed?" Jacobsen answered directly, "My word and my integrity." (Tr. 9/28 at 123.) One of this Court's overriding responsibilities is determining the credibility of witnesses. In A.M. Skier Agency, 747 A.2d at 939, the Pennsylvania Superior Court recognized this duty, stating that where the factual findings in question were supported by the testimony of witnesses, the appeals court would not disturb the lower court's credibility determination without good reason. See also Shepherd v. Pittsburgh Glass Works, LLC, 25 A.3d 1233, 1245 (Pa. Super. Ct. 2011), noting that where there was conflicting evidence on the question of whether the employee would reveal trade secrets to his new employer and the court chose to believe the employee's testimony that he would not do so, the record supported the lower court's decision and would be affirmed. While we recognize CentiMark's position that such disclosure would be inevitable, we find Jacobson's demeanor, testimony, and past actions reflect a strong probability of the opposite

result.

In sum, we conclude CentiMark does not have a substantial likelihood of prevailing on the merits of its PUTSA claim and will deny the motion for a preliminary injunction in this regard.

C.   Unfair Competition

1.   *Background:*   In brief, CentiMark alleges in the Complaint that by becoming employed by Nations Roof South and disclosing its confidential business information to his new employer, Jacobsen is engaged in unfair competition with CentiMark. His conduct "has caused and will continue to cause damage to CentiMark's goodwill, customer relationships, prospective customer relationships, contractual relationships and valuable business interests" and is "contrary to honest industrial and commercial practices." (Complaint, ¶¶ 108 and 110.)

2.   *Applicable law:*   The Pennsylvania Supreme Court has noted that in addition to the traditional scope of "unfair competition" which limits this tort to the act of "palming off of one's goods as those of a rival trader," the concept has been extended in some business settings to include misappropriation as well as misrepresentation. Pottstown Daily News Publishing Co. v. Pottstown Broadcasting Co., 192 A.2d 657, 662 (Pa. 1963)

41

(internal citations omitted.) "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things,. . . tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." Synthes (USA) v. Globus Med., Inc., CA No. 04-1235, 2005 U.S. Dist. LEXIS 19962, *24 (E.D. Pa. Sept. 14, 2005) (citing cases); see also EXL Labs. LLC v. Egolf, CA No. 10-6282, 2011 U.S. Dist. LEXIS 25295, *26 (E.D. Pa. Mar. 11, 2011), recognizing that Pennsylvania courts have adopted a definition of unfair competition which is coextensive with that in the RESTATEMENT (3d) OF UNFAIR COMPETITION, § 1. "Nevertheless, the term may not be construed as a virtual catch-all for any form of wrongful business conduct or to include all forms of modern business torts." Giordano v. Claudio, 714 F. Supp.2d 508, 522 (E.D. Pa. 2010) (internal quotations omitted.)

  3. *Plaintiff's reasonable probability of eventual success in the litigation.* CentiMark devotes little attention to this third Count of its Complaint in its proposed findings of fact and conclusions of law. It concentrates only on the claims that if Jacobsen were to disclose confidential and proprietary information to a competitor, such disclosures would give the competitor an unfair advantage; in addition, disclosure of

CentiMark's customer target list or "push up lead list" would provide the competitor with a "road map" in determining "how to attack certain customers." (Doc. No. 52, ¶¶ 28, 61, 70, and 134.)

We find nothing in CentiMark's pleadings which distinguishes the claim of unfair competition from its PUTSA claim inasmuch as both rest on the possibility of Jacobsen disclosing CentiMark's trade secrets and confidential business information. For the reasons discussed in the previous section, we therefore conclude that Plaintiff has failed to demonstrate a likelihood that it would succeed on the merits of this claim and will deny the preliminary injunction as to Count III.

Having considered the arguments of the parties and the evidence presented at the hearings of September 20 and 28, 2011, we deny Plaintiff's motion for a preliminary injunction enjoining Jacobsen's continued employment by Nations Roof South. An appropriate Order follows.

November 29, 2011                     _William L. Standish_____
                                          William L. Standish
                                       United States District Judge